IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF IOWA<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL EPHRAIM POTT-PEPPERMAN<br><br>Defendant. | Civil No. 4:23-cv-106<br><br><br><br>**COMPLAINT** |

Plaintiffs United States of America, on behalf of the United States Department of Health & Human Services ("United States"), and State of Iowa ("Iowa," and collectively with the United States, the "Government"), allege as follows:

## SUMMARY OF THE ACTION

1. This is an action for treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3732, and the Iowa False Claims Act ("IFCA"), Iowa Code §§ 685.1 et seq., as well as damages under the common law.

2. Defendant DANIEL EPHRAIM POTT-PEPPERMAN ("Pott-Pepperman" or "Defendant") is a psychologist who has practiced in the Southern District of Iowa.

3. Pott-Pepperman submitted false Medicare and Medicaid claims, primarily under HCPCS[1] code 90834 – "Individual psychotherapy for 45 minutes in an outpatient setting."

---

[1] Healthcare Common Procedure Coding System ("HCPCS"), as well as Current Procedure Terminology ("CPT") codes are widely used in the United States as the way medical providers classify and seek reimbursement for medical products, supplies, and equipment from healthcare payers.

4. Pott-Pepperman also submitted Medicare and Medicaid claims under codes that require him to be seeing a single patient, or otherwise working on a single patient's file, exceeding 24 hours in a day. These claims are known as "impossible days" and are presumptively fraudulent.

5. Plaintiffs seek to recover the amounts of fraudulent claims paid as a result of false claims made or caused to be made by Pott-Pepperman, trebled, plus penalties.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is a Plaintiff. In addition, the Court has subject matter jurisdiction over the FCA cause of action under 28 U.S.C. § 1331 and supplemental jurisdiction over both the IFCA cause of action and the common law cause of action, under 28 U.S.C. § 1367(a).

7. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, resides in, transacts business in and has committed the alleged acts in the Southern District of Iowa.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendant can be found in, resides in, and transacts business in the Southern District of Iowa, and the alleged acts occurred in this District.

## PARTIES

9. One Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS"), which administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. ("Medicare"), and the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*. ("Medicaid").

10. The other Plaintiff in this Action is the State of Iowa.

11. The Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children. *See* 42 U.S.C. §§ 1396 et seq.; 42 C.F.R. § 430.0.

12. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

13. Defendant Pott-Pepperman is a psychologist who, from on or about July 29, 2012, until on or about May 30, 2019 (also referred to herein as the relevant time period), conducted his business within the Southern District of Iowa. On information and belief, he resides in the Southern District of Iowa.

## LEGAL AND FACTUAL ALLEGATIONS

14. Defendant Pott-Pepperman, during the relevant time period, was a participating Medicare and Medicaid provider.

15. During the relevant time period, Pott-Pepperman's practice significantly consisted of traveling to nursing homes and providing counseling sessions to patients at the facilities.

16. Many of Pott-Pepperman's patients suffered from dementia.

17. Most of Pott-Pepperman's patients were Medicare recipients. Some were also Medicaid recipients.

18. Beginning in 2013, Pott-Pepperman submitted claims to Medicare Part B and Medicaid for his psychotherapy sessions exclusively at the 45-minute rate using HCPCS code 90834.

19. Previously in 2012, Pott-Pepperman submitted claims to Medicare Part B and Medicaid for his psychotherapy sessions using (then) HCPCS code 90806. According to the American Psychological Association, HCPCS code 90806 was eliminated or discontinued at the end of 2012, and code 90834 replaced it.[2]

20. From 2012 through 2019, Pott-Pepperman also submitted claims to Medicare Part B and Medicaid for neuropsychological testing, always for six hours, and for psychological testing, always for two hours.

21. Most of the dates on which Pott-Pepperman submitted claims to Medicare Part B and Medicaid for neuropsychological and psychological testing are "impossible days" for which he submitted claims totaling more than twenty-four hours.

22. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act through Title XVIII of the Social Security Act. 42 U.S.C. §§ 1395 *et seq*. ("Medicare"). A person's age, disability, or affliction with end-stage renal disease determines his or her entitlement to Medicare benefits. *See* 42 U.S.C. §§ 426 to 426-1.

23. CMS, an agency of HHS, administers the Medicare program. For purposes of this action, there is one primary component to the Medicare Program: Part B. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services, as well as for a variety of "medical and other services." *See* 42 U.S.C. §§ 1395j to 1395w-6.

24. Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. Medicare Part B reimburses the

---

[2] *See* https://www.apaservices.org/practice/reimbursement/billing/2013-psychotherapy-codes (last accessed March 27, 2023).

cost of medically necessary physician services, including neuropsychological and psychological testing, rendered to Medicare Part B beneficiaries. Medicare Administrative Contractors ("MAC") are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

25. MACs are private insurance companies, under contract with CMS, that are responsible for determining the amounts Medicare owes to providers. *See* 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). Under their contracts with CMS, MACs review, approve, and pay providers' Medicare bills, called "claims," using federal funds. *See* 42 C.F.R. § 421.5(b).

26. A physician wishing to enroll in Medicare Part B must submit a provider enrollment form. The provider enrollment form requires physicians to certify the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855I.[3]

27. The vast majority of health care providers elect to enter into Medicare participation agreements, which allow them to bill Medicare Part B for their professional services. If a physician has entered into a Medicare participation agreement, the physician may bill Medicare Part B directly for each procedure he or she performed on a Medicare beneficiary.

28. For a claim to be eligible for payment by Medicare Part B, the claim must identify each service the physician rendered to the patient. The physician identifies the service performed

---

[3] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855i.pdf (last accessed March 31, 2023).

by using corresponding HCPCS codes, which are widely used in the United States as the way medical providers classify and seek reimbursement for medical products, supplies, and equipment from healthcare payers.

29. To obtain reimbursement from the Federal Health Care Programs, providers submit a claim form, which typically is done electronically. For claims to Medicare, providers submit CMS Form 1500[4] and/or its electronic equivalent, known as the 837P form, which contains the following certifications:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were incident to my professional service by my employee under my direct supervision, except as otherwise permitted by Medicare …
>
> NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**A. Pott-Pepperman previously fraudulently billed Medicare Part B for services he did not render.**

30. On October 28, 2014, Pott-Pepperman received a letter from AdvanceMed, a former CMS, who was contracted to conduct "Medicare Program Integrity Reviews" of Medicare providers located in a certain jurisdiction, including Iowa. The letter informed Pott-Pepperman that he was overpaid in the amount of $597.39.

---

[4] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf (last accessed March 31, 2023).

31. AdvanceMed's report accompanying the letter substantiated that Pott-Pepperman "was not present during the dates and times listed within the psychological services progress notes Dr. Pott-Pepperman signed for the twelve dates of service in question."

32. In sum, on twelve occasions, Pott-Pepperman submitted claims for seeing a patient at Kennybrook Village nursing facility when he did not see the patient.

33. Pott-Pepperman repaid the $597.39 in over-billing sought by CMS.

**B. Pott-Pepperman only ever billed for forty-five-minute psychotherapy sessions with patients and billed them at an implausible volume.**

34. Beginning on September 28, 2012, and continuing until May 30, 2019, Pott-Pepperman submitted claims for forty-five-minute psychotherapy sessions to Medicare and Medicaid at an implausible volume, claiming on numerous days to have seen patients in forty-five-minute increments in excess of eight hours, and often for twelve to eighteen hours.

35. Pott-Pepperman's progress notes show that he saw patients for forty-five minutes and that he saw patients back-to-back, in 45-minute increments, from early in the morning until late at night, without breaks for meals or the bathroom. For instance, on March 7, 2019, his progress notes show he saw his first patient at 6:45 am, his next patient at 7:30am, the following patient at 8:15am, and every forty-five minutes thereafter until his final session concluded at 8:15pm.

36. Pott-Pepperman's claims to Medicare and Medicaid for March 7, 2019, are consistent with his progress notes; he claimed eighteen forty-five-minute sessions over thirteen-hours and thirty-minutes for that day, which would have required him seeing patients without a single break for a meal, snack, water, or the restroom.

37. Nursing home staff and administrators reported to the Government that Pott-Pepperman often met with patients for less than forty-five minutes and in the range of five to thirty minutes.

38. Pott-Pepperman's claims to Medicare and Medicaid, as described in this Complaint add up. From July of 2012, through May 30, 2019, Pott-Pepperman received payment from the Government in amounts equal to or exceeding $867,519, including $756,109 for Medicare Part B claims and $111,409 for Medicaid claims.

**C. Video evidence of Pott-Pepperman's coming and going from the Granger Nursing Home facility shows that he was not present at the facility at times he claimed to be present in 2019.**

39. Pott-Pepperman's observed behavior at the Granger Nursing and Rehabilitation ("Granger") facility further demonstrates that he was defrauding Medicare and Medicaid.

40. Granger has a video surveillance system from which it is possible to ascertain when individuals enter and leave the facility.

41. Video surveillance from Granger for February through May of 2019, shows Pott-Pepperman consistently left the facility earlier than reflected in his patient notes.

42. At relevant times, Pott-Pepperman filed Medicare claims for 17-18 Granger residents twice a week on Monday / Thursday at the 45-minute rate using HCPCS code 90834, including the claims on March 7, 2019, discussed previously in ¶¶ 35 – 36.

43. It is impossible for Pott-Pepperman to have seen the number of patients he claimed he saw at Granger for the duration he claimed to have seen them in his 90834 claims to Medicare and Medicaid for those dates, based on the times Granger's video surveillance observed him entering and leaving the facility.

44. The discrepancy between Pott-Pepperman's claims and the actual time he left the Granger facility are reflected in the following table:

| Date | Therapy start time (per progress notes) | Therapy end time (per progress notes) | Time Pott-Pepperman entered the Granger facility | Time Pott-Pepperman exited the Granger facility | Time difference between Pott-Pepperman's observed exit and the time he claimed he saw his last patient | # of residents that Pott-Pepperman could not have seen (assuming 45-minute sessions) |
|---|---|---|---|---|---|---|
| 2/18/2019 | 6:45 AM | 7:30 PM | 6:32 AM | 3:50 PM | 3:40 | 5 |
| 2/21/2019 | 6:45 AM | 7:30 PM | 6:30 AM | 3:00 PM | 4:30 | 6 |
| 2/25/2019 | 6:45 AM | 8:15 PM | 6:35 AM | 3:53 PM | 4:22 | 6 |
| 2/28/2019 | 6:45 AM | 8:15 PM | 6:32 AM | 3:09 PM | 5:06 | 7 |
| 3/4/2019 | 6:45 AM | 8:15 PM | 6:30 AM | 4:59 PM | 3:16 | 5 |
| 3/7/2019 | 6:45 AM | 8:15 PM | 6:27 AM | 3:01 PM | 5:14 | 7 |
| 3/11/2019 | 6:45 AM | 8:15 PM | 6:29 AM | 4:47 PM | 3:28 | 5 |
| 3/14/2019 | 6:45 AM | 8:15 PM | 6:27 AM | 2:25 PM | 5:50 | 8 |

| Date | Therapy start time (per progress notes) | Therapy end time (per progress notes) | Time Pott-Pepperman entered the Granger facility | Time Pott-Pepperman exited the Granger facility | Time difference between Pott-Pepperman's observed exit and the time he claimed he saw his last patient | # of residents that Pott-Pepperman could not have seen (assuming 45-minute sessions) |
|---|---|---|---|---|---|---|
| 3/18/2019* | 6:45 AM | 8:15 PM | 6:26 AM | 6:02 PM | 2:13 | 3 |
| 3/21/2019 | 6:45 AM | 8:15 PM | 6:27 AM | 5:31 PM | 2:44 | 4 |
| 4/1/2019 | 6:45 AM | 8:15 PM | 6:27 AM | 5:25 PM | 2:50 | 4 |
| 4/4/2019 | 6:45 AM | 8:15 PM | 6:26 AM | 5:15 PM | 3:00 | 4 |
| 4/8/2019 | 6:45 AM | 8:15 PM | 6:28 AM | 5:47 PM | 2:28 | 4 |
| 4/11/2019 | 6:45 AM | 8:15 PM | 6:25 AM | 5:48 PM | 2:27 | 4 |
| 4/15/2019 | 6:45 AM | 8:15 PM | 6:26 AM | 5:55 PM | 2:20 | 4 |
| 4/18/2019 | 6:45 AM | 8:15 PM | 6:24 AM | 5:39 PM | 2:36 | 4 |

| Date | Therapy start time (per progress notes) | Therapy end time (per progress notes) | Time Pott-Pepperman entered the Granger facility | Time Pott-Pepperman exited the Granger facility | Time difference between Pott-Pepperman's observed exit and the time he claimed he saw his last patient | # of residents that Pott-Pepperman could not have seen (assuming 45-minute sessions) |
|---|---|---|---|---|---|---|
| 4/22/2019 | 6:45 AM | 8:15 PM | 6:26 AM | 5:58 PM | 2:17 | 4 |
| 4/25/2019 | 6:45 AM | 8:15 PM | 6:33 AM | 6:09 PM | 2:06 | 3 |
| 4/29/2019 | 6:45 AM | 8:15 PM | 6:21 AM | 6:15 PM | 2:00 | 3 |
| 5/6/2019** | 6:45 AM | 8:30 PM | 6:22 AM | 5:40 PM | 2:50 | 4 |
| 5/13/2019 | 6:45 AM | 8:15 PM | 6:24 AM | 5:44 PM | 2:31 | 4 |
| 5/16/2019 | 6:45 AM | 8:15 PM | 6:11 AM | 6:06 PM | 2:09 | 3 |

\* On March 18, 2019, video footage showed Dr. Pott-Pepperman entering Granger at 6:26 AM, exiting at 12:47 PM, re-entering at 1:08 PM, and leaving at 6:02 PM.

\*\* On May 16, 2019, Dr. Pott-Pepperman's records reflected that he conducted a "Diagnostic Assessment" for a new referral from 7:30 PM to 8:30 PM.

45. Based on this table Pott-Pepperman's claims were fraudulent in one of two ways: (1) if Pott-Pepperman saw patients on those days for a full forty-five minutes, then he could not have seen the number of patients for whom he submitted claims; or, (2) if Pott-Pepperman saw all

of the patients he claimed he saw on those days, then he could not have seen some or all of those patients for the full forty-five-minutes for which he claimed he saw them.

46. Based solely on the days for which video surveillance was obtained at Granger, Pott-Pepperman submitted a minimum of 101 false claims to Medicare and Medicaid for patients he could not possibly have seen at the times he claims to have seen them.

47. Pott-Pepperman knew or should have known (*i.e.*, acted with deliberate ignorance or reckless disregard for the truth) that he was not meeting with the number of patients he claimed for the amount of time that he claimed.

48. Without limiting the generality of the foregoing, Pott-Pepperman certainly knew that any claims asserted for patients he claims to have met with on days where video surveillance shows him leaving the Granger facility before he claims to have met with them, were false.

**D. Plaintiffs' Damages**

49. Plaintiffs have been damaged by paying money to Pott-Pepperman for the fraudulent claims he submitted to Medicare and Medicaid.

**COUNT I**
**Violation of the United States False Claims Act**
**(Presentation of false claims)**
**31 U.S.C. §§ 3729 – 3732**

50. Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

51. As set forth in Paragraph 21, Pott-Pepperman was required to certify that the claims he submitted were "true, accurate, and complete."

52. From on or about July 29, 2012 – May 30, 2019, Pott-Pepperman knowingly presented false claims to Medicare for approval, because Pott-Pepperman knew or should have known: (i) he did not meet, at all, with the patient; or, (ii) he saw the patient for less than the forty-five minutes he claimed to have seen the patient; or, (iii) he submitted claims exceeding twenty-

four hours for a single date, and his certifications of the truthfulness, accuracy, and completeness of such claims were false.

53. By virtue of the said false or fraudulent claims, the United States incurred damages and is therefore entitled to treble damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## COUNT II
### Violation of the United States False Claims Act
### (Making or using false records or statements)
### 31 U.S.C. §§ 3729 – 3732

54. Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

55. From on or about July 29, 2012 – May 30, 2019, Pott-Pepperman knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. Specifically, Pott-Pepperman knowingly made materially false records or statements, by asserting claims for Medicare reimbursement when: (i) he did not meet, at all, with the patient; or, (ii) he saw the patient for less than the forty-five minutes he claimed to have seen the patient; or, (iii) he submitted claims exceeding twenty-four hours for a single date.

56. By virtue of the said false records and statements, the United States incurred damages and is therefore entitled to treble damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## COUNT III
### Violation of the Iowa False Claims Act
### (Presentation of false claims)
### Iowa Code Ch. 685

57. Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

58.     From on or about July 29, 2012 – May 30, 2019, Pott-Pepperman knowingly presented false claims to Medicaid for approval, because Pott-Pepperman knew or should have known: (i) he did not meet, at all, with the patient; or, (ii) he saw the patient for less than the forty-five minutes he claimed to have seen the patient; or, (iii) he submitted claims exceeding twenty-four hours for a single date, and his certifications of the truthfulness, accuracy, and completeness of such claims were false.

By virtue of the said false records and statements, the state of Iowa incurred damages and is therefore entitled to treble damages under the Iowa False Claims Act, plus a civil penalty for each violation of the Act.

## COUNT IV
### Violation of the Iowa False Claims Act
### (Making or using false records or statements)
### Iowa Code Ch. 685

59.     Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

60.     From on or about July 29, 2012 – May 30, 2019, Pott-Pepperman knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the state of Iowa. Specifically, Pott-Pepperman knowingly made materially false records or statements, by asserting claims for Medicaid reimbursement when: (i) he did not meet, at all, with the patient; or, (ii) he saw the patient for less than the forty-five minutes he claimed to have seen the patient; or, (iii) he submitted claims exceeding twenty-four hours for a single date.

61.     By virtue of the said false records and statements, the state of Iowa incurred damages and is therefore entitled to treble damages under the Iowa False Claims Act, plus a civil penalty for each violation of the Act.

## COUNT V
## Payment by Mistake

62. Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

63. From on or about July 29, 2012 – May 30, 2019, Plaintiffs paid funds to Pott-Pepperman under the erroneous belief that the claims for payment were based on representations that were factually accurate and for services that Pott-Pepperman rendered as described.

64. Plaintiffs' erroneous beliefs were material to the payments made by Plaintiffs to Pott-Pepperman.

65. Because of Plaintiffs' mistakes of fact, Pott-Pepperman received payments to which he was not entitled.

66. By reason of the payments described above, Plaintiffs are entitled to damages.

## COUNT VI
## Unjust Enrichment

67. Plaintiffs incorporate paragraphs 1 – 49 as if fully set forth herein.

68. From on or about July 29, 2012 – May 30, 2019, Pott-Pepperman was enriched by the receipt of Medicare and Medicaid payments.

69. The enrichment was at the expense of the United States and state of Iowa.

70. It would be unjust to allow Pott-Pepperman to retain the benefits of some or all of the Medicare and Medicaid payments he received in which he obtained the benefits by concealing or otherwise failing to report that he did not see the patient he claimed to have seen or that he saw the patient he claimed to have seen for a shorter duration than the forty-five minutes he claimed to have seen the patient.

WHEREFORE, Plaintiffs ask the Court to enter judgment in their favor as follows:

(a) On Counts I and II against Pott-Pepperman for treble the United States' damages, plus civil monetary penalties as set forth in the United States False Claims Act; and,

(b) On Counts III and IV against Pott-Pepperman for treble the state of Iowa's damages, plus civil monetary penalties as set forth in the Iowa False Claims Act; and,

(c) On Counts V and VI against Pott-Pepperman for Plaintiffs' damages as proved at trial, plus pre-judgment and post-judgment interest, and any other such relief the Court deems appropriate.

Dated March 31, 2023

Respectfully submitted,

Richard D. Westphal
United States Attorney

By: /s/ Jason R. Lawrence
Jason R. Lawrence
Assistant United States Attorney
U.S. Courthouse Annex, Suite 286
110 E. Court Avenue
Des Moines, Iowa 50309
Telephone: (515) 473-9309
Facsimile: (515) 473-9282
Email: Jason.lawrence2@usdoj.gov

AND

BRENNA BIRD
Attorney General of Iowa

By: /s/ Tricia Dieleman
Tricia Dieleman
Assistant Attorney General
321 East 12th St.
Lucas State Office Bldg. - 3rd Floor
Des Moines, IA 50319
Telephone: (515) 250-2178
Email: Tricia.Dieleman@dia.iowa.gov
Attorney for Plaintiff – State of Iowa